**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**


**JAMES A. SCARBOROUGH,**

     **Plaintiff,**

**vs.**                                                  **Case no. 3:03cv328-RS-EMT**

**NORMAN Y. MINETA,
in his capacity as
Secretary of Transportation,**

     **Defendant.**

_____/


## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court are Defendant's Motion for Summary Judgment (Doc. 34) and Plaintiff's Response (Doc. 41).

### I.  FACTS

In June 2001, Plaintiff James Scarborough was employed by the Federal Aviation Administration (FAA) as a trainee for the position of air traffic control specialist at the FAA's air traffic control tower in Mobile, Alabama.  On May 13, 2002, the FAA terminated Scarborough's training at the Mobile facility and reassigned him to its Pensacola facility.  At the time of his termination and reassignment, Scarborough was fifty-five years old.

Scarborough contends that during his training at the Mobile facility, he was subjected to harassment and disparate treatment because of his age and because of his past participation in an illegal strike of the Professional Air Traffic Controllers Organization (PATCO).  Scarborough alleges the following instances of harassment and disparate treatment:

1.  He was provided less time to complete his training than were younger

1

trainees at the Mobile facility;

2.  He was counseled for tardiness when younger employees were forgiven for their late arrivals;

3.  He experienced physical and verbal abuse by his primary trainer for minimal deviations from procedures and operational techniques;

4.  He was frequently referred to as "old man" and chastised for being "too slow";

5.  The instructor with whom Scarborough had made satisfactory progress in his training was removed, and Scarborough was reassigned to trainers with whom he had personality conflicts and differences of opinion;

6.  Defendant terminated Scarborough's training based on its reason that he lacked the ability to perform the duties required of an air traffic control specialist; Defendant's proffered reason for discharge was pretextual because Scarborough was a competent air traffic control specialist, having been certified as an air traffic control specialist at a more complex facility; and

7.  Defendant's decision to terminate and reassign Scarborough was based on unlawful motives designed to discriminate against and harass Scarborough because of his age.

As a result of the discrimination and harassment allegedly suffered by Scarborough, Scarborough claims that he incurred stress-related illnesses which medically disqualified him from employment and which caused him to request retirement.  On or about March 29, 2002, Scarborough filed a complaint with the FAA alleging discrimination and harassment on the basis of age as well as retaliation.  After the FAA denied the claim and Scarborough exhausted all administrative remedies, Scarborough commenced this action on August 1, 2003.  The Complaint alleges that Defendant violated the provisions of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 et seq., by subjecting Scarborough to discriminatory treatment and harassment on the basis of age when it terminated Scarborough's training at the Mobile facility and reassigned him to the Pensacola facility and when it committed or failed to remedy the harassing conduct outlined above. (Doc. 1.)

Defendant filed a Motion for Summary Judgment on February 17, 2006 (Doc.

34).  Defendant argues that summary judgment is warranted because Scarborough has failed to establish a prima facie case of discrimination and hostile work environment harassment on the basis of age under the ADEA.  Defendant also contends that even if Scarborough can establish a prima facie case of discrimination on the basis of age, it terminated and reassigned Scarborough for legitimate, nondiscriminatory reasons. According to Defendant, Scarborough simply failed to demonstrate competence in the duties required of an air traffic control specialist despite adequate training and his previous work experience.

## II.  DISCUSSION

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant

has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant, here the defendant, satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).

"The summary judgment rule is to be applied in employment discrimination cases as in any other case." Fitzpatrick v. Winn-Dixie Montgomery, Inc., 153 F. Supp. 2d 1303, 1305 (11th Cir. 2001) (citing Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc)). In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

4

**B.  The Substantive Law**

**1. Age Discrimination**

Under the ADEA, "It shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  A plaintiff may establish that a discharge was discriminatory in one of three ways:  (1) direct evidence of discriminatory intent; (2) statistical proof of a pattern of discrimination; or (3) satisfying the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  Direct evidence of discrimination is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption."  Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987) (quoting Black's Law Dictionary 413 (5th ed. 1979) (citation omitted) (emphasis omitted)).  "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (citing Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir. 1988); Thompkins v. Morris Brown College, 752 F.2d 558, 563 (11th Cir. 1985); Dunning v. National Industries, Inc., 720 F. Supp. 924, 929 n. 6 (M.D. Ala. 1989)).

Scarborough has offered no direct evidence of discriminatory intent or statistical proof that Defendant engaged in a pattern of age discrimination.  The only evidence offered by Scarborough that could arguably be characterized as evidence of direct discrimination is Scarborough's affidavit together with a statement by Bryan Wilson, one of Scarborough's instructors, alleging that Scarborough had been chastised for being "old" and "slow."  Assuming that Scarborough was indeed the target of such comments, the record is deplete of information concerning the circumstances in which the remarks were uttered.  Specifically, it is uncertain whether the comments were made by instructors or other trainees; whether the remarks were frequent or isolated; whether the comments were uttered within the scope of training or during lunch or breaks; and

whether the remarks were directed at Scarborough's ability to perform the job or were mere generalized observations unrelated to his job performance.  Indeed, "[r]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."  E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990).  Furthermore, "'[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination."  Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999) (citing Early v. Champion Int'l Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990) (citations and omitted)).  An example of direct evidence of age discrimination is a memorandum stating, "Fire Early - he is too old."  Early, 907 F.2d at 1082.  The evidence offered by Scarborough fails to meet this rigorous standard.  Even assuming that Scarborough was indeed taunted for being "old" and "slow," such comments were unaccompanied by direct threats of termination or contextualized evidence indicating blatant discriminatory animus.  Thus, allegations that Scarborough was merely labeled "old" and "slow" are not direct evidence of discrimination.

If Scarborough is to prove that his termination from training at the Mobile facility and reassignment to the Pensacola facility were discriminatory, he must therefore do so based on circumstantial evidence.  When a plaintiff alleges discrimination based on circumstantial evidence, the court applies the three-tiered analysis set forth in McDonnell Douglas and refined in Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S. Ct. 1089, 1093-95 (1981).  See Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1383 (11th Cir. 1994).  Under the McDonnell Douglas paradigm, a plaintiff is required to first establish, by a preponderance of the evidence, a prima facie case that creates a rebuttable presumption of unlawful discrimination.  McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  "The plaintiff's burden of establishing a prima facie case serves, in part, to assure that the plaintiff has some competent proof that she was treated differently than similarly situated employees."  Lang v. Star Herald, 107 F.3d 1308, 1312 (8th Cir. 1997).  Second, if the plaintiff successfully establishes the prima facie case of discrimination, the burden of production "then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."

6

McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  Finally, if the employer successfully articulates some legitimate, nondiscriminatory reason for the employee's rejection, the plaintiff must demonstrate by a preponderance of the evidence that the employer's stated reason for rejecting the employee was merely a pretext for discriminating against him.  Id. at 804.  Despite the shifting burdens of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.

### a.  McDonnell Douglas Step One:  The Prima Facie Case of Discrimination

A plaintiff may establish a prima facie case of discrimination under the ADEA by demonstrating that he (1) was a member of the group of persons aged forty to seventy protected by the ADEA; (2) was subjected to adverse employment action; (3) was qualified to perform the job from which he was rejected; and (4) (a) was replaced by a substantially younger person or (b) similarly situated younger employees were treated more favorably.  Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999); Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1313-14 (11th Cir. 1994); Lauderdale v. Johnston Indus., Inc., 139 F. Supp. 2d 1315, 1319-20 (M.D. Ala. 2001) (citing Chapman AI Transport, 229 F.3d at 1024 & Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001)).

Scarborough has failed to establish a prima facie case of discrimination under the ADEA.  The first requirement of the prima facie case is satisfied because Scarborough was fifty-five years old at the time he was terminated from training at the Mobile facility and reassigned to the Pensacola facility.  Therefore, Scarborough was within the age group protected by the ADEA.

Defendants concede that the third requirement of the prima facie case is also satisfied.  The Eleventh Circuit has held that when a plaintiff is discharged from a previously held position, rather than denied a promotion or benefit, the plaintiff need not prove that he was qualified for the position in order to establish a prima facie case of unlawful discrimination.  See Damon v. Fleming Supermarkets of Florida, 196 F.3d

7

1354 (11th Cir. 1999).  Instead, the plaintiff's qualification for the position can be inferred.  Pace v. Southern Railway System, 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983) (concluding that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy a prima facie case, can be inferred").

This Court agrees that the third requirement of the prima facie case is satisfied; however, that determination is based on reasons different from those offered by the parties.  This Court is not convinced, nor have the parties cited any legal authority, to support their mutual conclusion that Scarborough's termination from training and reassignment qualifies as "discharge from a previously held position" or that Scarborough was qualified for the position of air traffic control specialist.  Scarborough alleges that prior to his training at the Mobile facility, he was assigned to the Orlando Air Traffic Control Tower and Indianapolis Air Traffic Control Center; he was later assigned to the Jacksonville Air Route Traffic Control Center where he was certified on all non-radar positions and was awaiting assignment to radar training; he was qualified to act as an air traffic control specialist at the time of his transfer to the Mobile facility; and he held an airman certificate with a control tower operator rating.  (Doc. 41:1-2 ¶¶ 4-5.)

Despite Scarborough's alleged qualifications, the uncontroverted evidence raises serious questions about Scarborough's competence:

(1)  Scarborough retired from the FAA and then was reinstated on July 25, 1997.  After his reinstatement and up until his training period at the Mobile facility, Scarborough was not awarded *any* certificates from *any* air traffic facility. (Doc. 35-2:23 ¶ 4.)  Thus, when Scarborough was terminated from the Mobile facility in 2002, it had been at least *five years* since Scarborough had obtained a formal acknowledgement of competence in the form of a certificate;

(2)  It is unclear from the record whether Scarborough's certificates and experiences at the Orlando, Indianapolis, and Jacksonville facilities were similar to the duties required of him at the Mobile facility such that Scarborough's qualifications at the Mobile facility can be properly inferred;

(3)  Scarborough questioned his own qualifications when he stated in a memorandum to Herndon, "I readily admitted . . . that I have developed some "Bad

8

Habits" over the years . . . , some examples being occasional incorrect phraseology and my willingness to accept any guidance to help me correct those deficiencies."  (Doc. 35-2:25 ¶ 1.)

(4)  Scarborough was only a "trainee," not a full-fledged air traffic control specialist, at the time of his termination and reassignment.  Scarborough's status as a trainee distinguishes his case from factual situations in which the discharged employee was not merely a trainee but was a regular employee in the position from which the employee was rejected;

(5)  This Court questions whether termination from training and then "reassignment" to the exact position for which one was training, albeit at a facility different from the training facility, truly qualifies as "discharge from a previously held position."

For each of these reasons, it cannot properly be inferred that Scarborough was indeed qualified to perform the job from which he was rejected or that Scarborough was discharged from a previously held position.  Devoid of important factual information, this Court refuses to speculate about Scarborough's qualifications and abstains from accepting the parties' conclusory legal determination that Scarborough was indeed qualified for the position of air traffic control specialist because of his experience, certifications, and previously held positions.

Nevertheless, Scarborough is still entitled to a finding in his favor on the third requirement of the prima facie case for purposes of this summary judgment analysis.  Because Scarborough was terminated from training based on evaluations which Scarborough contends were *themselves* unlawfully discriminatory, it would be inappropriate to treat the evaluations as positively establishing that Scarborough was unqualified for the position.  See Casiano v. Gonzales, 2006 U.S. Dist. LEXIS 3593, 40-42 (N.D. Fla. 2006) ("since the denial of privileges was based on peer reviews that Casiano contends were themselves discriminatory, it would be inappropriate to treat those reviews as positively establishing that Casiano was unqualified for his job as Clinical Director"); Sledge v. Goodyear Dunlop Tires North America, Ltd., 275 F.3d 1014, 1019 (11th Cir. 2001) (fact that plaintiff failed written examination did not establish

that he was unqualified for position where exam itself was simply claimed a pretext for discrimination).

Whether Scarborough was qualified for the position of air traffic control specialist is crucial to this litigation.  Construing the evidence in the light most favorable to Scarborough for purposes of establishing the prima facie case at the summary judgment stage, it will be assumed that Scarborough at least meets the minimum professional qualifications for the position from which he was rejected.  Whether Scarborough was indeed qualified for the position of air traffic control specialist is more appropriately addressed in the second and third steps of the McDonnell Douglas analysis, which assess the employer's legitimate, nondiscriminatory reasons for termination and whether such reasons are pretextual.  See Damon, 196 F.3d at 1360; Clark v. Coats & Clark, 990 F.2d 1217, 1227 (11th Cir. 1993) (holding that evidence of employee's performance reprimands does not establish that employee was unqualified for the position for purposes of satisfying the requirements of the prima facie case but may indicate that company was legitimately concerned about employee's performance).  Therefore, for purposes of summary judgment, Scarborough has satisfied the third requirement of the prima facie case of unlawful discrimination under the ADEA.

Scarborough has clearly failed, however, to satisfy the second and fourth requirements of the prima facie case.  With respect to the second requirement, both parties, again without discussion, simply agree that Scarborough experienced adverse employment action when he was terminated from training at the Mobile facility and reassigned to the Pensacola facility.  This Court disagrees.  An "adverse employment action" in a case under Title VII's anti-discrimination clause is one that causes "a serious and material change in the terms, conditions, or privileges of employment."  Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001).  Although the parties have failed to address the issue, the Eleventh Circuit has held that an employee's transfer from one position to another, even when the transfer is involuntary, is not necessarily an adverse employment action.  See Doe v. Dekalb County School Dist., 145 F.3d 1441, 1454 (11th Cir. 1998).  Instead, an employee's transfer constitutes an adverse employment action only if a "reasonable person in [Plaintiff's] position would have found

the transfer to be adverse under all the facts and circumstances." Id. Facts and circumstances which indicate that a transfer is adverse include lesser pay, diminished responsibilities, a decrease in prestige, disruption in professional growth, lower potential for advancement, and a lower return on one's investment in education, training, or seniority. Id. at 1452. In short, a transfer that qualifies as an "adverse employment action" is a transfer that represents a "form of demotion." Id.

Although Scarborough's training was terminated, his employment with Defendant was not terminated; rather, Scarborough was merely transferred or reassigned from one facility to another. Pursuant to an agreement between the FAA and the National Air Traffic Controllers Association (NATCA) governing "training failures," Scarborough was "reassigned" to the position of air traffic control specialist at the Pensacola facility, despite having been terminated from the air traffic control specialist training program at the Mobile facility. (Doc. 35-3:3.) Whether this transfer can accurately be viewed as a "demotion" is uncertain as the factual record pertaining to this issue was left undeveloped by the parties. Indeed, at first blush, it would appear that Scarborough was actually *promoted* when he was reassigned to the Pensacola facility because at the Pensacola facility, Scarborough presumably assumed the full duties and responsibilities of an air traffic control specialist; at the Mobile facility, Scarborough was employed as a mere trainee. The record contains no information on the amount of pay, potential for advancement, prestige, and nature of the duties performed by an air traffic control specialist at the Pensacola facility relative to the Mobile facility. The undisputed facts indicate, however, that Scarborough was offered the position of "air traffic control specialist" in Pensacola at a "base pay of $73,702." (Doc. 35-3:3.)

In attempting to satisfy his burden of proof on the issue of whether he suffered "adverse employment action," Scarborough offers a single allegation: the Pensacola facility to which he was transferred was "less complex" than the Mobile facility from which he was terminated. (Doc. 1:3 ¶ 21.) This Court concludes, however, that simply because Scarborough applies the unsupported, conclusory, and amorphous description "less complex" to the Pensacola facility does not, without additional information, warrant the inference that the transfer to the Pensacola facility was a "form of demotion" and

hence, "adverse employment action."  Indeed, evidence from the record suggests that Scarborough may have even *preferred* the Pensacola facility over the Mobile facility. During his training period, Scarborough resided in Crestview, Florida.  (Doc. 1:1 ¶ 2.) Scarborough's commute to the Pensacola facility was presumably less than his commute to the Mobile facility.  (Doc. 35-2:4-5 ¶ 25.)  In a memo memorializing a meeting on March 20, 2002, between Scarborough and Ronald Wehunt, the air traffic manager responsible for the overall management and training at the Mobile facility, Wehunt noted the following:

> Based on my interviews with the people [Scarborough] alleges were involved in a hostile work environment, witnesses to the alleged events and the EEO Counselor, I believe the events were a fabrication to leave [the Mobile facility] and be transferred to Pensacola . . . - I told him that was my conclusion . . . . I told [Scarborough] that I would not support his transfer to Pensacola and that, as far as I was concerned, the only way he was going to Pensacola was to check out, bid and then be selected . . . . I also told him that I thought he was trying to cause situations that could be construed as hostile in order to further his desire to transfer to Pensacola . . . . He repeatedly told me that if I thought he was such a bad employee, why did I want to keep him here.  I told him that I didn't think he was a 'bad' employee and that the intent of everyone here was to make him successful in training, but that he had to make the same effort that his instructors were making.  Unfortunately, I don't think [Scarborough] is willing to take responsibility for his actions and is trying to find a way out, especially if it's a transfer to Pensacola.

(Doc. 35-2:27 ¶ 4.)

Whether Wehunt's hypothesis is correct need not be decided by this Court. Instead, synthesizing the undisputed evidence, this Court concludes that the trier of fact cannot rationally infer that Scarborough experienced a demotion and hence, an adverse employment action, when:

(1)  Scarborough was reassigned to the *exact* position for which he had been training (air traffic control specialist) (Doc. 35-3:3);

(2) Scarborough was offered a base pay of $73,702 at the facility to which he had been reassigned (Pensacola) (Doc. 35-3:3);

(3) Scarborough has introduced no evidence of what his base pay at the Mobile facility would have been had he successfully completed the training program, thereby preventing any juror from concluding that Scarborough received less pay at the Pensacola facility; and

(4)  Scarborough was reassigned to a facility closer to his home and involving a shorter commute.  (Doc. 35-2:4-5 ¶ 25.)

This evidence, when balanced against Scarborough's unsubstantiated and ambiguous characterization of the Pensacola facility as "less complex" relative to the Mobile facility, permits but one reasonable conclusion:  Scarborough has failed as a matter of law to satisfy his burden of proof on the second requirement of the prima facie case.

Scarborough has also failed to satisfy the fourth requirement of the prima facie case of age discrimination under the ADEA.  Scarborough has offered no evidence, not even a conclusory statement or allegation, that he was replaced by a person substantially younger than himself.  In addition, Scarborough has failed to establish that younger employees who were similarly situated to him were treated more favorably.  Each allegation of disparate treatment based on age has been distilled from the record and is separately analyzed below:

(1) Scarborough alleges that he was "provided minimal orientation and instruction prior to being directed to test on facility operations and procedures.  The time allowed was less than that allowed for younger individuals who completed the training."  (Doc. 1:2-3 ¶ 12).  The record fails to substantiate this claim in its entirety.  According to the undisputed evidence:

i. Scarborough received approximately 140 hours of on-the-job training from three qualified instructors (Doc. 35-2:3 ¶ 14);

ii. The number of training hours received by Scarborough was greater than that received by *any* of the other seven trainees in the air traffic control specialist training program at the Mobile facility during Scarborough's training period (Doc. 35-3:13 ¶ 3.a.);

iii.  The number of training hours received by Scarborough totalled more

13

than <u>three times</u> the average number of hours (47.61 hours) needed to complete the training program (Doc. 35-2:6 ¶ 32);

       iv.  Mary Herndon, a training supervisor at the Mobile facility, stated in her interrogatory answer that Scarborough received "more classroom study than anyone *ever* has at this facility in the 18 years I have been here" (Doc. 35-3:13 ¶ 3.a.) (emphasis added);

       v.  During Scarborough's training period, Herndon counseled Scarborough and provided him with additional instruction (Doc. 35-2:3 ¶ 15.)  Herndon even suspended certain aspects of Scarborough's training in order to permit him to work on areas in which he demonstrated greater competence (Doc. 35-2:3 ¶ 15);

       vi.  When Frank Ashline, one of Scarborough's co-trainees who was approximately the same age as Scarborough, was asked in an interrogatory whether he believed his "orientation and study time was shorter than any younger [air traffic control specialist] who was in training with you," Ashline answered, "No."  (Doc. 35-3:30 ¶ 4.c.)

    In essence, rather than being treated less favorably, the undisputed evidence clearly indicates that Scarborough was treated *more favorably* than similarly situated younger trainees because he received more instructional time than any younger trainee. Therefore, Scarborough's claim that he was provided less time than younger individuals to complete the training is inaccurate and fails to establish disparate treatment as a matter of law.

    (2)  Scarborough alleges that he was "counseled" for tardiness on the second day of assignment to a certain training area but that "[d]uring the same period, other younger employees were forgiven late arrivals and were even the subject of jokes due to their tardiness."  (Doc. 1:3 ¶ 13.)  First, this Court emphasizes that Scarborough does not dispute his tardiness on the second day of assignment to that particular training area.  In fact, Scarborough does not dispute that he was tardy on *both* the first and second days of assignment to the training area.  (Doc. 35-3:7 ¶ 4.a.)  According to Vickie Wetherington, the operations supervisor who counseled Scarborough about his tardiness:

> I met with Mr. Scarborough as he exited the elevator.  I told
> him that this was the second day in a row that he had been late
> and he needed to do whatever it took to get to work on time.
> Mr. Scarborough just glared at me.  He then replied that he
> would have been on time but he had to wait for the elevator.
> I told him that I had observed him pull into the parking lot at 12
> minutes past the time he was due.

(Doc. 35-3:7 ¶ 4.a.)  Despite Scarborough's conclusory allegation that "younger
employees were forgiven late arrivals and were even the subject of jokes due to their
tardiness," Scarborough fails to identify those younger employees by name even though
he most likely knew their names or could have easily discovered their names because
only eight trainees, including Scarborough, were being trained concurrently at the
Mobile facility.  In contrast to Scarborough's generalized allegations, Wetherington
*does*, in her interrogatory, identify by name five trainees other than Scarborough whom
she counseled for tardiness. (Doc. 35-3:7 ¶ 4.b.)  If Scarborough disputed the
truthfulness of Wetherington's interrogatory or wished to show that Wetherington
disproportionately counseled only trainees within the protected age group for tardiness,
he presumably would have either attacked Wetherington's statements directly, filed
affidavits and interrogatories from younger employees indicating that they were not
counseled for tardiness, or submitted evidence of the ages of those employees
allegedly counseled for tardiness, thus permitting a jury to infer a pattern of disparate
treatment on the basis of age.  This Scarborough has failed to do.

In addition, Wetherington took no formal action against Scarborough for his
tardiness; rather, Wetherington "informally counseled" Scarborough.  (Doc. 35-3:7 ¶
4.a.)  Moreover, Scarborough did not accuse Wetherington of age discrimination or
harassment at the time Wetherington counseled him for being tardy.  (35-3:8 ¶ 5.)
Instead, Scarborough's concerns, if any, related to his fear of reprisal for his past
participation in an illegal PATCO strike:

> Several days after the [tardy incident], Mr. Scarborough
> requested to meet with me reference [sic] his being late.  He
> said that he knew people were out to get former PATCO
> people, and he felt he might be singled out.  I told him that was
> not the case in Mobile; that controllers here would do whatever
> it took to help someone get through training, if they put forth

15

> the effort.  I also told him that he could talk with Frank Ashline
> if he wanted reassurance that personnel here had no
> prejudices towards former PATCO employees.  I told him I
> particularly did not, as my husband had hired a former PATCO
> employee and I have several friends who are former PATCO.
>
> During this meeting Mr. Scarborough said he normally was an
> employee that was always early.  This proved to be true, and
> on several occasions I told him I appreciated his promptness.

(Doc. 35-3:10 ¶ 6.)  It was not until eight months later, after he received a memorandum

from his supervisor concerning his lack of progress in training, that Scarborough

identified the informal counseling he received for tardiness as an example of age

discrimination and harassment.  (Doc. 34:22.)  In essence, Scarborough offers no

evidence, other than his own conclusory allegation, that he was counseled for being

tardy while five other presumably younger individuals were not.  No legal authority need

be cited to support the obvious conclusion that one single, isolated incident in which (i)

a supervisor informally counsels an employee for arriving late to work; (ii) the employee

does not dispute his tardiness; (iii) the supervisor takes no formal action against the

employee; and (iv) the supervisor identifies without contradiction from the complaining

employee several other presumably younger employees who were also counseled for

tardiness fails to establish as a matter of law that the complaining employee was treated

differently than similarly situated younger employees.  Therefore, Scarborough's claim

that he was counseled for tardiness while similarly situated younger employees were

not fails to establish disparate treatment as a matter of law.

　　　(3)  Scarborough alleges that "during the period of training, [he] was subjected to

physical and verbal abuse by his primary trainer for minimal deviations from procedures

and for differences in operational techniques."  (Doc. 1:3 ¶ 14.)  Contrary to these

allegations, the record reveals no evidence of either physical or verbal abuse.  With

respect to the physical abuse claim, Scarborough contends that "On January 2, 2002,

he was physically attacked by his assigned instructor over a difference of opinion over

technique" when the instructor "grabbed a scratch pad from his hand . . . smashing his

fingers against a wooden podium."  (Doc. 41:2 ¶ 10, Doc. 35-3:23 ¶ 5.)  The assigned

instructor, Bill McMillan, stated in his interrogatory answer:

> The Complainant (sic) was not making notes on the scatch (sic) pad, he was writting (sic) aircraft call signs down on the scratch pad instead of a strip.  Writting (sic) the calls signs on the scratch pad first instead of a strip first was slowing his handling of aircraft.  When the complaintant (sic) would not stop this habit, I took the scratch pad away to change this habit.  The second time I took the scratch pad away the complainant attempted to stop me by putting his hand on the pad on the podium, so I grabed (sic) his arm to remove pressure from the pad so I could remove the pad.

(Doc. 35-3:23 ¶ 5.)  Regarding the incident, Herndon stated in her interrogatory answer:

> On 1/2/02, [Scarborough] said that in a previous session Bill McMillan had pulled a 'ground pad' from him.  He gave no specific date of ocurrence (sic) and asked that I not discuss it with Bill, but he would like to train with someone else.  I told him to check the schedule and let me know who he would like to train with.  I also told him to specifically ask individuals to see who would be willing to train.  He said he would do so.  I also talked to Bill McMillan and told him to have no outbursts with Complainant . . . Complainant told me several days later that he didn't know what was said to Bill McMillan by me, but that training was going much better.

(Doc. 35-3:14-15 ¶ 4.a. & b.)

Although this Court questions Scarborough's accuracy in labeling this incident a "physical attack" or "physical abuse," assuming for purposes of discussion that Scarborough is nevertheless correct and that this skirmish can be characterized as such, Scarborough still fails to show how such an altercation proves that he was treated more unfavorably than similarly situated younger trainees.  In fact, Scarborough himself stated that the conflict with McMillan occurred not because McMillan harbored animosity toward him because of his age, but because Scarborough and McMillan had a "*difference of opinion* over technique."  (Doc. 41:2 ¶ 10) (emphasis added).  A difference of opinion or even a physical assault is not discrimination based on age.  Indeed, when Scarborough reported the incident to Herndon, he did not suggest that it was a form of age discrimination or harassment.  (Doc. 35-3:20 ¶ 9.)

The record even fails to substantiate Scarborough's claim that he was subjected to "verbal abuse by his primary trainer for minimal deviations from procedures and for

differences in operational techniques."  First, Scarborough identifies no verbal statements made by his primary trainers, Bill McMillan and Harland Herron, which can even be characterized as "verbally abusive."  Instead, Scarborough admits that any statements made by McMillan and Herron concerned Scarborough's "deviations from procedures and differences in operational techniques."  How feedback that is legitimately related to training and instruction, even if such feedback relates to "minimal deviations from procedures," can be characterized as "verbally abusive" is beyond this Court's comprehension.  Second, even if such statements were indeed "verbally abusive," Scarborough does not allege nor does the record support an inference that such "verbal abuse" can be characterized as age discrimination.  Third, if Scarborough believed that the "verbally abusive" or unjustified corrective instruction that he allegedly endured were simply part of a conspiracy or scheme to corrupt his evaluations and discriminate against him based on his age, he presumably would have offered interrogatories, affidavits, depositions, or other discovery devices from younger trainees who experienced no such corrections, thus permitting an inference of age discrimination.  Scarborough has failed to submit such discovery.  Without evidence indicating that substantially younger trainees were not subjected to verbal correction when they deviated from procedures and established operational techniques, a jury could not reasonably draw an inference that the "abusive" statements allegedly experienced by Scarborough were because of his age.

(4)  Scarborough alleges that "[d]uring the period of training, [he] was frequently referred to as 'old man' or chastised for being 'too slow.'" (Doc. 1:3 ¶ 15.)  Scarborough does not allege, nor does the record indicate that Scarborough's trainers or supervisors referred to him as "old" or "old man"; rather, Scarborough alleges only that such comments were made "*during* his periods of training" with McMillan and Herron.  (Doc. 41:3 ¶ 13) (emphasis added).  Whether it was McMillan, Herron, or other employees who actually referred to Scarborough as "old" or "old man" is unclear.  Also unclear is the context in which such statements were made.  What is clear, however, based on Scarborough's failure to present evidence to the contrary, is that Scarborough never reported to Herndon "any remarks/comments directed at him (by trainers, supervisors,

18

co-workers) relative to his age and his ability to train; that he was old and slow; and/or that he was too old to train." (Doc.35-3:20 ¶ 9.)  In fact, Herndon stated in her interrogatory that Scarborough referred to *himself* as old:   "I did hear Complainant respond to controllers who commented that he needed to 'pick up the pace' that 'they should remember, he was old.'  He never reported to me that anyone even hinted that he was too old to train." (Doc. 35-3:20 ¶ 9) (emphasis in original.)

McMillan, Cynthia Norwood (the support specialist), and evaluation reports do confirm that Scarborough was advised at times to "speed up" because he was "too slow." (Doc. 35-3:24 ¶ 6, Doc. 35-3:27 ¶ 5.)  However, Scarborough offers no evidence that such comments were made because of his age or that younger trainees whose reaction times or levels of efficiency warranted similar feedback did not receive it; rather, such correction appears to have been targeted specifically at Scarborough because of his response times, not because of his age.  The interrogatory of Frank Ashline, the trainee who was approximately the same age as Scarborough, supports this conclusion.  When asked whether "any of [his] trainers refer[red] to [him] as old, slow, old and slow, and/or refer to [him] as too old to train," Ashline answered in the negative.  (Doc. 35-3:31 ¶ 6.)  Perhaps most damaging to Scarborough's claim of age discrimination, however, is that "Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or *diminished vigor* and *competence*." Barnes v. Southwest Forest Indus., 814 F.2d 607, 611 (11th Cir. 1987) (citing Loeb v. Textron, Inc., 600 F.2d 1003, 1016 (1st Cir. 1979); Holley v. Sanyo Mgf., Inc., 771 F.2d 1161, 1166-67 (8th Cir. 1985)) (emphasis added).  Here, Scarborough inappropriately commingles comments related to his speed with legal conclusions of age discrimination, seemingly implying that both are inseparable.  However, remarks concerning speed are assessments of "vigor" and 'competence"; they are not, standing alone, indicative of age discrimination.  Therefore, Scarborough has failed to prove that comments allegedly referring to him as "old man" and chastising him for being "too slow" satisfy the fourth requirement of the prima facie case of age discrimination.

(5) Scarborough alleges that the "facility staff training specialist" refused to assist

19

him with difficulties he was having with his instructors and that Defendant removed from Scarborough the only instructor who demonstrated competence in training him.  (Doc. 1:16-18).  Standing alone, this allegation is irrelevant for purposes of establishing a prima facie case of age discrimination under the ADEA.  Again, the only question germane to the analysis of the fourth requirement of the prima facie case is whether Defendant treated Scarborough *differently* than it treated similarly situated, substantially younger trainees.  Such a comparison is appropriately a requirement of the prima facie case to insure that it was indeed age, and not the policies, procedures, or even irrational behavior of Defendant which motivated Defendant's alleged discriminatory actions.  Indeed, this Court has stated that an employer can treat an employee within the protected class as badly as it treats similarly situated employees outside the protected class.  See, e.g., McQueen v. AirTran Airways, Inc., 2005 U.S. Dist. LEXIS 37461, *15 (N.D. Fla. 2006) (citing Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994) (applying this reasoning to causes of action based on the Pregnancy Discrimination Act)).

Scarborough has not identified a single similarly situated, substantially younger employee who was treated more favorably than he with respect to instruction and assignment of instructors.  Devoid of an appropriate comparison sample, the inquiry is confounded, rendering it impossible to determine whether it was indeed "age" or some other variable which actually motivated any given action or decision of Defendant.  Thus, even assuming for purposes of discussion only that Defendant treated Scarborough "unfairly," Scarborough has failed to show that such unfair treatment was because of his age.  If Defendant were indeed motivated by discriminatory animus toward Scarborough because of his age, Scarborough presumably would have obtained and submitted affidavits, depositions, and interrogatories of younger trainees who acknowledged that they were not subjected to such treatment.  Scarborough has failed to do so.  Without such comparative evidence, Scarborough simply cannot establish a prima facie case of age discrimination.

**b.  McDonnell Douglas Step Two:  Employer's Legitimate, Nondiscriminatory Reason**

Because this Court has determined that Scarborough has failed to establish a prima facie case of discrimination under the ADEA, it need not determine whether Defendant has offered a legitimate, nondiscriminatory reason for terminating and reassigning Scarborough or whether the proffered reason was pretextual.  Nonetheless, those issues will be analyzed.  In so doing, it will be assumed for purposes of this discussion only that Scarborough has established a prima facie case of discrimination under the ADEA.

 In showing that it had a legitimate, nondiscriminatory reason for terminating an employee, the defendant's burden is "exceedingly light."  Perryman v. Johnson Prods. Co. Inc., 698 F.2d 1138, 1142 (11th Cir. 1983) (citing Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094).  "The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation." Sermons v. Fleetwood  Homes of Georgia, 227 F. Supp. 2d 1368, 1380 (citing Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).  "[The proffered reason] is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine 450 U.S. at 254-55, 101 S. Ct. at 1094.  The defendant's burden at this stage of the analysis is "merely one of production, not of proof."  Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982).  "As long as the defendant articulates its reason with some specificity so that the plaintiff has a 'full and fair opportunity to demonstrate pretext,' the defendant's burden has been met." Sermons, 227 F. Supp. 2d at 1380 (quoting Burdine, 450 U.S. at 255-56, 101 S. Ct. at 1095).

Defendant has satisfied its burden of articulating a legitimate, nondiscriminatory reason for discharging Scarborough and for replacing his primary instructor, Bryan Wilson.  According to Defendant, "the plaintiff, although provided more training support than any one (sic) else, simply did not progress in his training.  Despite excessive hours of training, the plaintiff never demonstrated the necessary skills to perform the duties of a ground controller at the Mobile, Alabama airport or any airport with similar or greater

21

complexity."  (Doc. 39:3 ¶ D.)  Specifically, Defendant asserts that Scarborough's

> training had been marked with inconsistency, little
> improvement in the speed of performance, mis-communication
> (sic), and a failure on the part of the Plaintiff to use proper
> terminology and protocol.  In addition, the training reflected a
> poor attitude on the part of the plaintiff as he argued with his
> [on-the-job instructor] and supervisors alike.

(Doc. 35-2:3 ¶ 14.)

The documentation supports the proffered reasons for termination.
Approximately thirty evaluation reports of plaintiff's progress were submitted by the
parties.  The evaluation reports consist of six general job tasks: separation;
coordination; control judgment; methods and procedures; equipment; and
communication.  Each of the six job tasks is divided into more specific sub-tasks.  The
instructor evaluates the trainee's performance on each sub-task, assigning a rating of
"satisfactory," "needs improvement," or "unsatisfactory."  Space is also provided for the
instructor to comment on the trainee's performance.

While the reports undoubtedly indicate that Scarborough's performance on any
given day may have been satisfactory, it is also apparent from the reports that
Scarborough's performance was largely inconsistent and deficient in many areas,
particularly in the general job task areas of control judgment, methods and procedures,
and communication.  More specifically, Scarborough's performance was inconsistent
and deficient in the subtask areas of: applying "good control judgment," maintaining
"effective traffic flow" and "speed," and using "prescribed phraseology" and "appropriate
communications method."  The evaluation reports, when examined collectively, clearly
suggest that Scarborough was struggling in his training.

Defendant has also articulated a legitimate, nondiscriminatory reason for
replacing Scarborough's primary instructor, Bryan Wilson.  Scarborough alleges in his
Complaint that Wilson was "the only effective trainer he had during his tenure in the
facility."  (Doc. 1:3 ¶ 18.)  However, in January 2002, Herndon allegedly discovered that
Wilson "was teaching incorrect procedures" and removed Wilson as Scarborough's

primary instructor.  (Doc. 35-3:16 ¶ 5.)  A statement by Wilson himself suggests that Herndon's actions in removing him were based on legitimate, nondiscriminatory reasons.  When Wilson was asked by the Equal Employment Opportunity counselor why he was removed as Scarborough's instructor, Wilson stated that he "felt that his Supervisor, Mary Herndon, didn't have enough confidence in his . . . ability to train." (Doc. 41:63 ¶ 3).  Wilson did not indicate that Herndon's decision to remove him as Scarborough's trainer was part of a discriminatory scheme.  In addition, Herndon stated, and Scarborough did not contradict, that trainers were often shuffled from one trainee to the next.  According to Herndon, "more than 75% of trainees experience a team change during training." (Doc. 35-3:17.b.)  Therefore, Defendant has articulated legitimate, nondiscriminatory reasons for replacing Scarborough's primary instructor and for terminating and reassigning Scarborough.

### c. McDonnell Douglas Step Three: Pretext

"Once a defendant offers a legitimate, nondiscriminatory reason for its actions, the plaintiff must attack that reason 'head on and rebut it' so as to show that the reason is really pretext for discrimination."  Sermons, 227 F. Supp. 2d at 1381 (quoting Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).  Pretext can be established by evidence which "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994).  Stated differently, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 256, 101 S. Ct. at 1095).  The proffered explanation is unworthy of belief if the plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder" could disbelieve it.  Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996))

23

(citation and internal quotation marks omitted).  In order to prove pretext, the plaintiff may offer  "direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence." Woody v. St. Clair County Comm'n, 885 F.2d 1557, 1560 (11th Cir. 1989) (citing Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir. 1985)).  The plaintiff may also establish pretext by showing that the employer did not rely on the proffered explanations for its actions.  See Israel v. Sonic-Montgomery FLM, Inc., 231 F. Supp. 2d 1156, 1162 (M.D. Ala. 2002) (citing Chapman, 229 F.3d at 1024).

The evidence before this Court fails to support Scarborough's contention that Defendant's actions were pretexts for discrimination. First, Scarborough has not offered comparative or statistical evidence that Defendant routinely or indeed, at any time, terminated trainees who were within the age group protected by the ADEA.  According to Herndon, "[D]uring my 18 years here we have had at least 5 training failures.  See training department for names/age/dates.  It is my belief that all those terminated were not able to complete required job tasks."  (Doc. 35-3:19 ¶ 8.)  If Defendant engaged in a pattern of age discrimination at its Mobile facility, Scarborough presumably would have presented to this Court the names and ages of all "training failures" to permit such an inference.  This Scarborough has failed to do.

Second, the undisputed evidence indicates that Defendant not only provided Scarborough with an appropriate amount of instruction, but Defendant appears to have gone *out of its way* to assist Scarborough.  Scarborough received more hours of instruction than *any* of the other seven trainees in the air traffic control specialist training program at the Mobile facility during Scarborough's training period (Doc. 35-3:13 ¶ 3.a.). The number of training hours received by Scarborough totalled more than three times the average number of hours (47.61 hours) needed to complete the training program (Doc. 35-2:6 ¶ 32.)  Scarborough received "more classroom study than anyone *ever* has at this facility in . . .  18 years" (Doc. 35-3:13 ¶ 3.a.) (emphasis added).  Meetings were held to review and revise Scarborough's training objectives. (Doc. 35-2:13, 14, 15). Scarborough received counseling on areas in which he needed to improve and was provided a list of those areas.  (Doc. 35-2:22.) Certain aspects of Scarborough's training

were suspended to permit Scarborough to focus on areas in which he demonstrated greater competence and confidence.  (Doc. 35-2:3 ¶ 15.)

Third, the evaluation reports themselves, while providing seemingly genuine feedback about Scarborough's deficiencies, are nevertheless positive and encouraging. Nothing from the evaluation reports suggests that Defendant was "out to get" Scarborough or was focused on the single-minded goal of terminating Scarborough. Even when Wilson was removed as Scarborough's primary instructor, Scarborough's new instructor, Herron, provided uplifting feedback to Scarborough.  Below are samples of Herron's positive feedback to Scarborough:

(1) February 7, 2002 - "Good job!  No problems.  Phraseology was much better. Keep up the good work."  (Doc. 41:18.)

(2) February 14, 2002 - "Good job with light traffic.  Keep it up!"  (Doc. 41:30.)

(3) February 27, 2002 - "Another good job with light traffic.  Saw the traffic, and good seperation (sic) and movement instructions.  Jim needs heavier traffic now." (Doc. 41:32.)

(4) February 22, 2002 - "Good job with light traffic.  Do the exact same things when it gets busy."  (Doc. 41:34.)

(5) March 25, 2002 - "Good job of directing traffic to create good flow.  Also, priorities were better.  Jim worked the taxiing aircraft first.  Kept everyone moving."  (Doc. 41:52.)

(6) March 26, 2002 - "Good job, again.  Keep it up."  (Doc. 41:50.)

(7) March 27, 2002 - "Good job.  Continue the improvement.  Work on consistency at the position." (Doc. 41:58.)

(8) April 9, 2002 - "Good job.  We took the position with a bunch of work needing to be done.  Several aircraft calling and Jim did a good job of handling the situation.  Keep it up." (Doc. 41:60.)

(9) April 9, 2002 - "Another good session.  No problems." (Doc. 41:62.)

Between the dates of these positive evaluation reports, however, were other

reports indicating that Scarborough was performing inconsistently.  In fact, on the most recent evaluation report filed in the record and dated April 25, 2002, Herndon labeled Scarborough's performance "unsatisfactory" in four sub-tasks within the general job task categories of coordination, control judgment, and methods and procedures.  Herndon also wrote the following in the comments section of the evaluation report:  "During the last 20-30 hours, little progress has been achieved on basic skills required for working this position unsupervised.  In addition, there has been no improvement in consistency." (Doc. 35-2:11.)  Herndon's conclusion regarding consistency is supported by the approximately thirty evaluation reports submitted to this Court.   "[A] plaintiff may not establish that an employer's proffered reason is pretextual [when] the reason is one that might motivate a reasonable employer."  Combs, 106 F.3d at 1543.

Fourth, Scarborough does not question the accuracy of the specific assessments of his performance contained in the evaluation reports themselves.  Although each report permits the instructor to write open-ended comments which may lend themselves to greater "subjectivity,"  the rest of the evaluation form is a checklist composed of 24 specific sub-tasks.  The sub-tasks are narrowly written performance criteria that would easily lend themselves to verification in the event that Scarborough questioned the accuracy of his evaluation on any given sub-task.  Yet interestingly, Scarborough does not allege, nor does the evidence indicate, that Scarborough's instructors were inaccurate in assessing his performance on any specific sub-task; rather, Scarborough contends either that he had a "difference of opinion in phraseology and use of the various aids in the day-to-day control of traffic"  (Doc. 41-1:1-2 ¶ 2) or admits that "I have developed some 'Bad Habits' over the years, some examples being incorrect phraseology and my willingness to accept any guidance to help me correct these deficiencies."  (Doc. 35-2:25 ¶ 1.)  In fact, when asked by the training review board about his overall training experience at his termination/reassignment hearing, Scarborough conceded that he "did not do as well as he should have."  (Doc. 35-3:1 ¶ 4.)   Thus, Scarborough's admissions about his "bad habits" and deficient performance coupled with Scarborough's admitted refusal to accept correction permit but one reasonable conclusion: Scarborough's discharge resulted from his own failure and

26

resistance to instruction, not from any failure or alleged discrimination on the part of Defendant.

Finally, Scarborough's claims of pretext are undermined by the perceptions and behavior of Defendant's employees who are within the protected class.  When Frank Ashline, one of Scarborough's co-trainees who was approximately the same age as Scarborough, was asked in an interrogatory whether he believed his "orientation and study time was shorter than any younger [air traffic control specialist] who was in training with you," Ashline answered, "No."  (Doc. 35-3:30 ¶ 4.c.) When asked whether "any of [Ashline's] trainers refer[red] to [him] as old, slow, old and slow, and/or refer to [him] as too old to train," Ashline again answered in the negative.  (Doc. 35-3:31 ¶ 6.) Perhaps most devastating to Scarborough's case, however, is that three supervisors, Herndon, Wetherington, and Woodward are members of the class protected by the ADEA.  (Doc. 35-2:4 ¶ 21.)  At least one of these individuals, Woodward, was a member of the training review board, the body which reviewed Scarborough's progress and which recommended that Scarborough be terminated and reassigned.  (Doc. 35-2:32.) Woodward concurred with the unanimous decision to terminate Scarborough's training. Therefore, because Scarborough has not offered any direct or circumstantial evidence of pretext and because no such evidence can be reasonably inferred from the record, Scarborough has failed to establish that Defendant's actions toward him were anything but legitimate and nondiscriminatory.

### 2.  Hostile Work Environment

Scarborough also alleges that he was subjected to a hostile work environment based on age discrimination.  (Doc. 1:4, ¶ 22.)  The Eleventh Circuit has not explicitly decided whether claims of a hostile work environment based on age discrimination are actionable under the ADEA.  See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1244-45 n. 80 (11th Cir. 2001); United States EEOC v. Massey Yardley Chrysler Plymouth, 117 F.3d 1244, 1249 n. 7 (11th Cir. 1997) ("Neither party questions, hence we do not actually decide, whether the hostile environment doctrine developed in Title VII actions applies in an ADEA action, a question so far decided specifically by only one circuit court of appeals, the Sixth.  The latter stated, "we find it a relatively

27

uncontroversial proposition that such a (hostile environment) theory is viable under the ADEA.'  Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834 (6th Cir. 1996)"). Nevertheless, the Eleventh Circuit has at least implicitly recognized the viability of a hostile work environment claim based on age discrimination when it analyzed such claims using the Title VII framework of analysis.  See Apodaca v. Sec'y of the Dep't of Homeland Sec., 2006 U.S. App. LEXIS 528, *9-*12 (11th Cir. 2006); see also Hipp, 252 F.3d 1208 at 1245 n. 80 (holding that Plaintiffs did not satisfy the requirements of a hostile work environment "[a]ssuming hostile work environment claims are cognizable under ADEA").

If a hostile work environment claim under the ADEA is actionable, Scarborough must show that (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a legal basis exists for holding the employer liable.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Mendoza v. Borden Inc., 195 F.3d 1238, 1245 (11th Cir. 1990).

In other words, a plaintiff alleging a hostile work environment under Title VII must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993).  This fourth requirement of the prima facie case contains both an objective and a subjective component: the behavior must result in both an environment "that a reasonable person would find hostile or abusive" and an environment that the victim "subjectively perceives . . . to be abusive."  Id. at 21-22.  In evaluating the objective severity of the harassment, the following factors are considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris,

510 U.S. at 23, 114 S. Ct. at 371).

Scarborough has failed to establish a prima facie case for a hostile work environment.  As already discussed in this Court's analysis of Scarborough's claims of age discrimination under the <u>McDonnell Douglas</u> framework, none of the alleged conduct or remarks of the Defendant, except for one allegation, were based on Scarborough's age.  Instead, Defendant articulated legitimate, nondiscriminatory reasons for its conduct, and Scarborough has failed to prove pretext.

The only allegation that warrants further analysis is Scarborough's allegation that he was "subjected to verbal attacks and references to being too old."  (Doc. 41:3 ¶ 13.) Bryan Wilson, Scarborough's first trainer, substantiated this allegation when he answered in the affirmative after being asked, "Have you ever heard anyone call [Scarborough] 'old?'" (Doc.41:63.)  Even assuming, however, that Scarborough was indeed subjected to "verbal attacks and references to being old," Scarborough has introduced no evidence about the frequency of the comments, the severity of the comments, the context in which the comments were made, or how such comments interfered with his job.  Such information is vital to substantiate a hostile work environment claim because the Supreme Court has held that Title VII is only implicated in the case of a workplace that is "*permeated* with discriminatory intimidation, ridicule and insult," not where there is the "mere utterance of an . . . epithet."  <u>Harris</u>, 510 U.S. at 21, 114 S. Ct. at 370 (emphasis added).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998). Allegations that Scarborough was referred to as "old," even if such allegations are true, simply do not permit a reasonable factfinder to conclude that Scarborough's environment was so "permeated with discriminatory intimidation, ridicule and insult" as to constitute a hostile work environment.  Comments related to Scarborough's age are, if anything, merely "offensive" rather than physically threatening or humiliating.

Two cases are instructive on the issue of whether Scarborough experienced a hostile work environment.  The Eleventh Circuit held in <u>Apodaca</u> that the plaintiff failed

29

to establish a hostile work environment claim where he was told that he was "too old to learn anything new."   Because the comment occurred only once, the court determined that the conduct was not severe or pervasive.  Apodaca, 2006 U.S. App. LEXIS at *11-*12.  In contrast to Apodaca, the Eleventh Circuit in Miller upheld a jury verdict finding that the ethnic slurs hurled at the plaintiff were "severe and pervasive" where the plaintiff was the target of such slurs three to four times a day on a daily basis; employees shouted the comments at the plaintiff in order to "intimidate" him, "taunt" him, or "berate" him on his job performance; and plaintiff was humiliated by the slurs because they were sometimes used as a form of reprimand in the presence of others.  Miller, 277 F.3d at 1277.

The alleged comments in this case are most factually similar to the facts in Apodaca.  The record is devoid of all information concerning the frequency, severity, and context in which the comments were made to even warrant submission to a jury. When pressed by Wehunt to provide information about the alleged harassment, Scarborough could not provide Wehunt with any specific facts.  (Doc. 35-2:4 ¶ 25.) Thus, unlike in Miller, Scarborough does not allege that he was subjected to harassing comments multiple times a day and on a daily basis, that such comments were intended to "intimidate," "taunt," or "berate" him, or even that he was humiliated by such remarks. In fact, when advised by his instructors to "pick up the pace," Scarborough allegedly told his instructors that "they should remember, he was old." (Doc. 35-3:20.)  It should also be noted that Scarborough failed to complain about the allegedly harassing behavior until March 2002, eight months after Scarborough began training and suspiciously, less than a week after Scarborough was notified in a memorandum that he was not progressing in his training and needed to improve.  (Doc. 35-2:4 ¶¶ 20, 22.) Scarborough has failed to establish a prima facie case of a hostile work environment.

### 3.  Retaliation

The ADEA prohibits not only discrimination on the basis of age but also discrimination based on an individual's opposition to age discrimination or an individual's charge, testimony, assistance, or participation in an investigation, proceeding, or litigation based on age discrimination. 29 U.S.C. § 623(d).  Although Scarborough

alleges retaliation in his Response to Motion for Summary Judgment (Doc. 41-1:2-3 ¶ 7), a claim for retaliation was never pled in the Complaint. (Doc. 1.)  Even assuming, however, that a claim for retaliation was properly pled, Scarborough fails to establish a prima facie case of retaliation.

A claim of retaliation for filing a complaint with a government agency is also governed by the <u>McDonnell Douglas</u> burden-shifting framework.  <u>Anduze v. Fla. Atl. Univ.</u>, 151 Fed. Appx. 875, 877 (11th Cir. 2005).  In order to establish a prima facie case of retaliation, Plaintiff must show (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action.  <u>Weaver v. Casa Gallardo, Inc.</u>, 922 F.2d 1515, 1524 (11th Cir. 1991). The burden of production then shifts to Defendant to articulate legitimate, non-discriminatory reasons for the adverse employment action. If Defendant carries this burden of production, the burden shifts back to Plaintiff to show that the asserted reasons were pretextual. <u>Donnellon v. Fruehauf Corp.</u>, 794 F.2d 598, 601 (11th Cir. 1986).  The Eleventh Circuit has defined what is meant by a "causal link" between the protected expression and the adverse conduct:

> The causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

<u>Simmons v. Camden County Bd. of Educ.</u>, 757 F.2d 1187, 1189 (11th Cir.), <u>cert. denied</u> 474 U.S. 981, 106 S. Ct. 385 (1985).

For the same reasons enunciated by this Court in its analysis of the prima facie case of discrimination under the ADEA, Scarborough has failed to demonstrate that he suffered adverse employment action when he was discharged from training at the Mobile facility and reassigned to the Pensacola facility.  Therefore, Scarborough has failed to satisfy the second requirement of the prima facie case of retaliation.

Assuming for purposes of discussion that Scarborough was subjected to adverse

action, Scarborough has failed to show a causal link between the protected expression and any alleged adverse action.  At the time that Scarborough filed his complaint with the FAA in March 2002, Defendant had already notified Scarborough several weeks earlier that he was not making progress in his training and that seven areas needed to be improved.  (Doc. 35-2:22.)  In addition, the evaluation reports completed after Scarborough filed his complaint with the FAA show no indication of retaliation.  The comments on the evaluation reports were still positive and encouraging.  (Doc. 41:55-63.)  The reports do not include a sudden barrage of negative feedback which might be associated with an improper retaliatory motive.  Nor does Scarborough allege other adverse conduct on the part of Defendant that might conceivably be characterized as retaliatory after he complained.  Therefore, Scarborough has failed to satisfy the third requirement of the prima facie case of retaliation.

Even if Scarborough could satisfy the prima facie case of retaliation, Defendant has articulated legitimate, nondiscriminatory reasons that were not pretextual for evaluating Scarborough in the manner in which he was evaluated and for discharging Scarborough from training.  These reasons were articulated and analyzed in steps one and two of the McDonnell Douglas inquiry exploring Scarborough's age discrimination claim.

### III. CONCLUSION

1.  Plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that he was a victim of age discrimination, hostile work environment harassment, or retaliation under the ADEA.

2.  Defendant's Motion for Summary Judgment (Doc. 34) is granted.

3.  The clerk shall enter judgment dismissing Plaintiff's claims with prejudice.

4.  The clerk shall close the file.

**ORDERED** on April 7, 2006.


**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**